### FRIESEKE v. FRIESEKE.

1. GUARDIAN AD LITEM—NEGLECT—RELIEF IN EQUITY.
    Equity will relieve an insane defendant from the consequences of the neglect of her guardian ad litem appointed on complainant's nomination.

2. BILL OF REVIEW — INSANE DEFENDANT — DECREE OBTAINED THROUGH NEGLECT OF GUARDIAN.
    Where a decree of divorce against an insane defendant rests entirely upon testimony elicited by leading questions to which her guardian ad litem made no objection and the decree was not opposed though barely supported by the evidence considered in its most favorable light, an application by defendant's general guardian to file a bill of review should be granted.

3. SAME—DECREE FOR ALIMONY.
    The application should also be granted in such a case where it appears that through the guardian's neglect defendant's allowance for permanent alimony in lieu of dower was based on evidence disclosing only one-fifth the value of complainant's property.

4. GUARDIAN AD LITEM — PROPRIETY OF APPOINTMENT — NOMINEE
   OF COMPLAINANT.

   A near relative or close friend of an insane defendant should be
   appointed guardian ad litem, rather than some person nomi-
   nated by complainant.

Appeal from Shiawassee; Smith, J. Submitted No-
vember 16, 1904. (Docket No. 88.) Decided December
14, 1904.

Bill by Herman C. Frieseke against Marie Frieseke for
a divorce. On petition of defendant for a rehearing, the
petition was dismissed, and defendant appeals. Reversed.

*Watson & Chapman,* for complainant.

*Albert L. Chandler,* for defendant.

CARPENTER, J. This is an appeal from an order deny-
ing a rehearing after a decree of divorce had been pro-
nounced in favor of complainant and against defendant.
The facts, so far as material to this decision, are these:
At the time this suit was commenced defendant was in-
sane, and confined in the insane asylum at Pontiac. The
subpœna was served upon her personally. After the
lapse of time for appearing, complainant filed a petition
for the appointment of a particular named person as
guardian ad litem for defendant. This petition, together
with notice of hearing the same, was also served on de-
fendant and the superintendent of the asylum. At the
day set for hearing said petition the trial court appointed
complainant's nominee guardian ad litem. This nominee
was not related to defendant, and does not appear to have
been a special friend of defendant. The solicitor for the
guardian ad litem and for complainant stipulated for an
early hearing of the case. On this hearing, complainant,
his daughter, and said guardian ad litem (the latter testi-
fying to the condition of defendant), were the sole wit-
nesses. Upon this testimony, and on the day of the hear-
ing, complainant was given a divorce on the ground that

defendant had been guilty of extreme cruelty, and alimony in the shape of an annuity of $200 during her life was given defendant in lieu of dower and all other claims upon complainant.

It is stated in the petition for rehearing, among other things, that the complainant's charges of extreme cruelty were untrue; that the testimony given on the hearing, if properly analyzed, did not warrant a decree of divorce; that complainant himself has been guilty of acts of extreme cruelty, which are there specified; that the allowance for alimony is grossly inadequate, because complainant has property amounting in value to over $40,000.

In his answer to this petition, respecting the charges of his own extreme cruelty and the valuation of his property, complainant contents himself with saying that he objects to their consideration, "for the reason that they do not in any manner tend to weaken complainant's cause for a divorce, but, if the facts were all true, which this complainant denies, they would only tend to show that complainant might be entitled to a divorce."

Under the circumstances we must conclude, even if complainant had made a case entitling him to a divorce, which is extremely doubtful, as we shall hereafter show, defendant had a complete defense to that case in her counter charges, and that the allowance for alimony was grossly inadequate. (For the award of alimony, as will more fully appear hereafter, must have been made on the assumption that complainant was worth about $8,000.)

It is clear, therefore, that the decree works an injustice to defendant, and it ought to be vacated unless it may be said that she did not avail herself of the proper opportunity to present her testimony. It cannot be said that defendant neglected the proper opportunity to present her case, because she personally did not attend to her defense. She was incapable of doing that. Under the circumstances she had to depend upon the good faith and diligence of her guardian ad litem. That guardian ad litem, as heretofore stated, was the nominee of com-

plainant, and apparently not a special friend of defendant's. We accept the decision of the trial court, which exonerated said guardian ad litem from all charges of bad faith. But if, through his neglect, defendant lost rights because her case was not properly presented, the consequences should in equity—and this is a suit in equity—be chargeable to complainant, who nominated him, rather that to defendant, who was powerless to act.

Assuming, as claimed by said guardian ad litem, that, though he used all diligence, he could find no testimony tending to prove the charges of complainant untrue, it was nevertheless his duty to defendant to insist that complainant should obtain no unfair advantage by asking leading questions, or in any other way; to object to a decree against defendant unless the testimony clearly warranted it; and to see that the financial condition of complainant be clearly proved, in order that a proper award of alimony be made to defendant.

Said guardian ad litem, though represented at the hearing by a solicitor, made no objection to leading questions. To show the opportunities he neglected, we quote from complainant's testimony:

" *Q.* I want to know if you know of any time when she would exclude herself from the children? *A.* Yes.

" *Q.* When was it? Shut herself away from the children? *A.* Yes. * * *

" *Q.* What interest did she manifest in the success of your daughter while she was away from home? Did you talk and try to read the letters your daughter wrote, or talk about your daughter or Fred while in school? What was her manner? Appear to care anything for them? *A.* No, she never had any interest, and, knowing that fact, we never talked much about it.

" *Q.* Some time in her record you must have learned she cared nothing about them? *A.* Yes.

" *Q.* When was it that you learned from her manner that she cared nothing about hearing about what your children were doing in school? *A.* That gradually grew on her all these years; kept getting worse from time to time until it reached this stage.

"*Q.* Did you ever start in to read your daughter's letters? *A.* I often showed her the letters, laid them down for her to read. I never read them to her that I can remember.

"*Q.* She paid no attention to them? *A.* That I can't remember. I can't say she didn't read them, but not to my knowledge. She didn't pay any attention to them. As far as her manner indicated itself, she rather not pay any attention to them. * * *

"*Q.* That finally became her manner toward you, and the domestic relations between the children and each other? *A.* Yes.

"*Q.* That continued for a space of— *A.* For that time.

"*Q.* For more than ten years? *A.* Yes, for most of our married life.

"*Q.* What can you say about this conduct toward yourself and towards your children having destroyed all the social relations and tender relations of home, so far as the wife was concerned? *A.* I can only say this: That it destroyed them entirely. There was no harmony in our household. Not that we had any words, or anything of that kind, but there was a cold indifference during all our life.

"*Q.* You set out in your bill that it caused you great mental anguish and suffering. Is that true? *A.* Yes, sir.

"*Q.* How did it affect your children as to taking all the playfulness and joy and pleasure from them in the home? Did it destroy that? *A.* It made our household gloomy, of course, excepting such times as they would come to me."

We quote from the examination of complainant's daughter:

"*Q.* About how long after the marriage was it before she began to manifest a coldness toward you and your brother, if at all? *A.* Almost immediately. * * *

"*Q.* Was it cold indifference toward you children? *A.* Yes, sir.

"*Q.* What can you say of that making the household a very solemn and melancholy place? *A.* Well, it did.

"*Q.* Did it take all the good time and enjoyment of you children and your father out of your home? *A.* It certainly did. * * *

"*Q*. Did her manner indicate to you that she didn't care anything about it, and would be better pleased if you weren't succeeding very well?  *A*. Yes, sir.   *   *   *

" *Q*. Did it grow worse as time went on?  *A*. Yes, sir.

" *Q*. Was it almost unbearable along the latter years? *A*. It was."

It is to be presumed that this testimony—weak as it is— would have been still weaker if it had not been drawn out by these leading questions.   This presumption finds support in certain other testimony, namely:

Complainant himself testified:

"I, of course, don't say by that [referring to his testimony that defendant's action made his home unpleasant] she is entirely to blame.   Of course, things were unpleasant between us all, and, of course, it made it unpleasant."

And the daughter testified:

"She was cold and distant in a way, and still in a way she was kind.   She was kind toward father.   I cannot say that she ever ill-treated him to my knowledge."

It is obvious that by asking these leading questions complainant obtained an advantage—an unfair advantage—and it was clearly the duty of the guardian ad litem to object to it.

Complainant testified that during the latter portion of their married life defendant occasionally occupied a separate bed for more than a month at a time.   Unless this constituted an act of extreme cruelty—and I do not understand that to be claimed—it may be said that the record does not show that defendant ever did to complainant or to complainant's children a cruel act, or ever said to complainant or to complainant's children a cruel word.

I think it fair to say that the ground upon which complainant seeks a divorce is that his home was unpleasant partly, and only in part, because defendant, by her manner and actions, indicated toward his children cold indifference; and this indifference was mingled with kindness. If this matter had been presented, as it should have been, by the guardian ad litem to the trial court, we cannot be-

lieve that a decree of divorce would have been granted complainant.

Neither did the guardian ad litem, acting through his solicitor, make proper proofs respecting complainant's wealth. As already stated, the only witness upon that subject was complainant himself, and the only testimony on that subject was brought out by the cross-examination of the solicitor of the guardian ad litem. We quote that testimony:

" Q. I wish you would tell the court what are your present means. Give a general idea as to your property. * * * A. That would be hard to estimate at this time for the reason my property—my brother and I own everything together.

" Q. What is the income from your manufacturing business? A. It would be hard to make an estimate on that.

" Q. About what? A. A good deal of that is in real estate, and hard to put a price on.

" Q. I say about what is your income from the brick business? A. The income of the brick business? From two to three thousand a year.

" Q. By the Court: You get half of that? A. Yes, sir.

" Q. You own a home? A. Yes, sir.

" Q. What is the value of that? A. The home I consider worth about $3,000.

" Q. What would you say your interest in the brick business? Would you say $5,000 would be a fair valuation of your interest in it? A. It would be so long as the business continued. If it discontinued, it would not be that."

We get from this testimony simply an estimate of the value of the home and the value of complainant's interest in the brick business. It is fairly to be inferred from this testimony that much of the property owned by complainant and his brother is real estate. The value of that real estate is not shown. It is clear that the guardian ad litem and his solicitor did not bring out evidence which they should have known would have increased the allowance for alimony to defendant.

Under these circumstances, we are bound to say that the guardian ad litem neglected his duty; that, as a consequence, defendant did not have the hearing which in equity she was entitled to have; and that the consequences of this neglect should be borne by complainant, whose nominee the guardian ad litem was, rather than by defendant. In such a case, therefore, it is clearly our duty (see *Sheldon* v. *Hawes*, 15 Mich. 519; *Johnson* v. *Shepard*, 35 Mich. 125; *Mickle* v. *Maxfield*, 42 Mich. 310; *Murray* v. *Ingersoll*, 100 Mich. 286; *Kinsel* v. *Kinsel*, 126 Mich. 693) to reverse the order of the circuit court denying the defendant a rehearing, and to remand the case for further proceedings.

We think it proper to say that complainant should not have been permitted to select defendant's guardian ad litem. The trial court should have appointed to this office some near relative or close friend of defendant, or some other person who could be relied upon to guard her interests. And under the circumstances of the case we feel called upon to say that the legal guardian of defendant should be substituted in the place of the present guardian ad litem. The defendant will recover costs of this court.

The other Justices concurred.